## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CHRIS VAUGHAN, individually and on behalf of all others similarly situated,

    *Plaintiff,*

vs.

ATHENA BITCOIN, INC.,

    *Defendant.*

_____/

**CLASS ACTION**

**Case No.**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Chris Vaughan ("Plaintiff") brings this action against Defendant Athena Bitcoin, Inc. ("Athena") for failing to disclose excessive fees and to protect consumers from scams in violation of the Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq.*, and the Florida Financial Exploitation of Vulnerable Adults Act (the "Financial Exploitation Act"), Fla. Stat. § 825.103. In support of its claims, Plaintiff states as follows:

## INTRODUCTION

1.    Athena has systematically imposed excessive, undisclosed fees on consumers using its Bitcoin Automated Teller Machines ("BTMs"). Rather than being transparent and upfront over its BTMs fees, Athena instead has pocketed hundreds of thousands of dollars in undisclosed fees from unsuspecting consumers—charging up to 26% of each transaction—while failing to provide clear, conspicuous, or meaningful disclosures of these charges.

2.    Athena—one of the country's largest BTM operators—maintains nearly 3,600 BTMs nationwide. These BTMs ostensibly allow consumers to purchase cryptocurrencies, such as Bitcoin, using cash.[1] But instead of facilitating fair transactions, Athena's BTMs function as

fee-traps: Athena deceives consumers to impose exorbitant and deceptive fees far exceeding industry norms.



(*Athena BTM image via* [https://athenabitcoin.com/host-an-atm](https://athenabitcoin.com/host-an-atm))

3.      Bitcoin is digital "money" that is stored in a digital "wallet"—like a bank account but without the oversight or security provided by a financial institution. Bitcoin wallets are identified by long strings of letters and numbers called "addresses." Each transaction with a Bitcoin wallet is recorded on a public ledger called the "blockchain."

4.      When a consumer purchases Bitcoin through a BTM, the operator typically charges a small percentage fee or exchange spread disclosed to the consumer *before* confirming the transaction. Athena, however, disguises its effective rate through a combination of inflated exchange rates, undisclosed surcharges, and additional process fees, ("BTM Fees") leaving consumers unaware that as much as a quarter of their transaction value has been siphoned away.

5.      Athena's BTMs are often located in convenience stores, gas stations, and small retail outlet outlets—settings where consumers have little access to accurate pricing or comparison tools. Once a consumer deposits cash into the machine to be converted to Bitcoin, Athena

immediately deducts its hidden BTM Fees before transferring the remaining balance in Bitcoin. Consumers typically discover the true cost only after the transaction is complete by reviewing their receipt and comparing the amount of Bitcoin received with the prevailing market rate.

6.      Athena profits immensely by imposing excessive, undisclosed fees on BTM transactions—up to 26% of each transaction. Exacerbating this problem, Athena has misrepresented its refund policy in every direction— imposing a no refunds policy in its Terms of Service while arbitrarily capping the fee refunds when victims diligently force the issue.

7.      Athena violates FDUPTA by engaging in unfair and deceptive trade practices, including by failing to adequately disclose transaction fees, utilizing unconscionable contract provisions, unfairly denying consumers the ability to recover the BTM Fees, operating without a money transmission license, and failing to implement adequate consumer protection measures.

8.      Athena's conduct violates FDUPTA by deceiving consumers regarding the existence and magnitude of the company's excessive fee structure and its ability (or inability) to refund those fees. Consumers who challenge Athena's undisclosed fees face a labyrinth .

9.      Athena's misconduct is compounded by its failure to maintain proper oversight or compliance with consumer-protection laws. The company has operated BTMs without adequate licensing, monitoring, or consumer-disclosure procedures, enabling it to impose its BTM Fees unchecked. Its practices stand in stark contrast to industry norms that require clear display of exchange rates and  total transaction costs prior to purchase.

10.     Athena's conduct constitutes unfair and deceptive trade practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Athena misrepresents and conceals the nature and amount of its transaction fees, employs unconscionable contract terms, and unfairly denies refunds or recourse to affected consumers.

11.     Plaintiff, on behalf of himself and Class of similarly situated consumers, brings this action to stop Athena's deceptive and predatory fee practices, and force it to refund improper BTM

Fees. Plaintiff seeks injunctive relief, restitution, damages, civil penalties, attorneys' fees, and all other appropriate relief to ensure that Athena fully discloses its fee structure, implements transparent pricing mechanisms, and provides an adequate refund process for consumers.

## PARTIES

12.     Plaintiff Chris Vaughan is a citizen and resident of Texas and a consumer as defined by Fla. Stat. § 501.203(7).

13.     Defendant Athena Bitcoin, Inc. is a Delaware corporation formed on September 18, 2015. Athena maintains its headquarters in Miami, FL. Athena operates BTMs across the United States, including within this District and internationally, enabling consumers to purchase Bitcoin using cash. Athena trades over the counter (outside a national exchange but subject to SEC oversight) as Athena Bitcoin Global with a total market capitalization of more than $200 million and yearly revenue of $192 million.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of interest and costs and the parties are citizens of different states.

15.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant is headquartered in this District, Defendant is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction, and because Defendant provides and markets its services within this District thereby establishing sufficient contacts to subject it to personal jurisdiction.  Further, Defendant's tortious conduct against Plaintiff occurred from within this District.

## FACTUAL ALLEGATIONS

### I.     OVERVIEW OF BITCOIN ATMS

16.     BTMs have rapidly expanded across the globe within the last decade. BTMs are physical kiosks that facilitate the purchase and sale of cryptocurrency, typically Bitcoin, using cash or debit cards. BTMs function outside the traditional banking system and connect directly to digital "wallets," which serve as repositories from which Bitcoin is sent or received.

17.     Unlike traditional ATMs, which connect to regulated financial institutions, BTMs connect to cryptocurrency exchanges and blockchain networks. Instead of dispensing or withdrawing funds from a bank account, a BTM converts deposited cash into Bitcoin and transfers that Bitcoin to a digital wallet designated by the user—often via a quick-response ("QR") code scanned at the machine.

18.     The first Bitcoin ATM opened in Vancouver, Canada in 2013m marking the beginning of the commercial deployment of cryptocurrency kiosks. Since then, the number of BTMs has expanded rapidly, tracking the rise in cryptocurrency's popularity and market value.

19.     Today, more than 30,000 BTMs operate worldwide, with approximately 90 percent located in the United States. Most BTMs are situated in convenience stores, gas stations, and transportation hubs, marketed as a convenient on-ramp for consumers seeking quick access to cryptocurrency.



*(BTM growth chart available at https://coinatmradar.com/charts/growth/united-states/)*

20.     BTM operators in the United States are required to comply with the same core regulatory obligations applicable to traditional money transmitters and financial service providers These include customer-identification requirements, transaction-limit rules, anti-money-laundering obligations, and consumer-protection disclosures.

21.     To complete a transaction, consumers must connect a digital wallet to the BTM, deposit cash, and confirm the amount of cryptocurrency to be purchased. The BTM then transmits a corresponding amount of Bitcoin—minus the operator's fees—to the consumer's wallet address. The transaction is permanently recorded on the public blockchain ledger.

22.     BTMs are often promoted as offering speed and accessibility, but they also carry substantial risks and costs for consumers. Most operators charge significantly higher fees than online exchanges, frequently exceeding 10 to 25% of the transaction amount. These fees are often obscured through inflated exchange rates or inadequate disclosures on the machine's display.

23.     Regulators and consumer-protection agencies have warned that BTM transactions may expose users to fraud, undisclosed fees, and lack of recourse. Once a transaction is completed and recorded on the blockchain, it is irreversible; consumers cannot reclaim deposited funds or contest excessive fees.

24.     Despite these risks, BTM operators continue to market their services as a safe and transparent means of purchasing cryptocurrency. In practice, many fail to clearly disclose their fee structures or provide meaningful information about refund policies, effectively trapping consumers into paying excessive or hidden charges.

25.     Athena plays a major part in this expanding crisis—operating 3,500 BTMs worldwide, including having operated several locations throughout Florida. Transaction records show that Athena's kiosks in the District of Columbia average $4,592 per transaction—far more cash than most people would be comfortable carrying into a gas station. Athena takes an average of 20% per transaction:



26.     Like many of its competitors—but to a far greater and more harmful extent—Athena has capitalized on the lack of oversight and transparency in the BTM industry by charging exorbitant, undisclosed fees, misrepresenting its pricing, and adopting policies designed to prevent consumers from recovering improperly charged amounts.

**II.     Athena's Profits Are Derived from Undisclosed Fees**

27.     Through apps and exchanges, Bitcoin can be purchased online for fees ranging from 0.24% to 3%. But Athena BTMs charge consumers exorbitant fees of up to 26%—without ever disclosing those fees to the consumer. Athena's markup is hidden within a fee-inclusive price that Athena misleadingly displays as the "exchange rate."

28.     None of Athena's online marketing efforts disclose the fact that Athena charges transaction fees, much less their magnitude. Athena's online advertisements direct consumers to the nearest BTM for "freedom," "security," and "satisfaction." Athena's website makes no mention of the existence of the fee:



*(Sample of Athena's online advertisements)*

29.    Athena's fees are also not clearly disclosed at the BTM. Consumers are not told that they will receive significantly less in cryptocurrency than the cash they insert at any point before or during the process and may only learn they have been charged a large fee after the transaction—if at all.

30.    Before June 2024, Athena's BTMs made no mention of the steep transaction fees. After June 2024, Athena amended its Terms of Service, which are only presented to consumers in a text box the first time they use a machine. The Terms of Service do not use the word "fee" at all. Instead, the Terms of Service speak of a "Transaction Service Margin," which is buried deep within a 700+ word wall of text that is only accessible by scrolling the BTMs' digital interface. Athena's Terms of Service state that:

> A margin (the difference between the market price and the actual selling
> or buying price at the kiosk) will be assessed on your purchase or sale

of cryptocurrencies in an amount disclosed to you at the time you make
the offer to purchase or sell cryptocurrency.

31.     The Terms of Service falsely claim that the magnitude of the Transaction Service
Margin will be disclosed at the time of purchase when, in fact, Athena never discloses the margin. In
order to determine the margin, a user must independently compare the spot price of Bitcoin to the
"exchange rate" charged at the machine or compare the Bitcoin received to the amount of cash deposited
into the BTM.

32.     The Terms of Service present an example of the fee that obfuscates rather than
elucidates:

> For example, in the context of a purchase transaction, if you tender a
> $100 bill and the Transaction Service Margin is $4, the Transaction
> Service Margin will be assessed and deducted from the $100 and the
> remaining $96 will be used to calculate the quantity of any
> cryptocurrencies purchased by you at the quoted price.

33.     This hypothetical example confusingly misstates the process as a flat fee taken prior to
the purchase at the quoted price rather than a fee hidden within the quoted price. In addition, this
example is grossly misleading in the context of a 26% markup.

34.     A real-world example provides a more accurate illustration of how the fee functions.
On August 21, 2024, a scam victim deposited $10,000 cash into an Athena BTM located inside the
Exxon station at 3535 Connecticut Ave NW. The price of Bitcoin at the time of the transaction was
$59,936 for one Bitcoin, but Athena marked up the Bitcoin price by 25.4% and charged the victim an
"exchange rate" of $80,315 per Bitcoin. So, of the $10,000 cash fed into the BTM, Athena transferred
just $7,463 worth of crypto (or 0.1245 of a Bitcoin) to the scammer's wallet identified by the victim.
Athena retained the remaining $2,537 as a fee, which was not disclosed to the victim.

35.     In SEC filings, Athena describes the primary source of its revenue much more plainly:

> We charge a fee per crypto asset available through our Athena Bitcoin
> ATM, equal to the prevailing price at U.S.-based exchanges plus a
> markup that typically ranges between 13% and 26%. The prices shown
> to customers on our Bitcoin ATM are inclusive of this price spread...The

markup varies by location. It is determined by a proprietary method that
is maintained as a trade secret.

Athena does not disclose the breakdown of the markup during the transaction. Instead, Athena

hides these fees in the price of the cryptocurrency displayed during the transaction. Athena's fees

are excessive, inconsistent, undisclosed, and "maintained as a trade secret" to the detriment of

District consumers.

36.     Part of the "secret" of Athena's fee method is that the more Bitcoin a user buys, the

higher the fee percentage. For example, in the District of Columbia, small transactions are assessed a

fee as low as 13%, and then steadily increase until maxing out at approximately a 26% fee for the largest

transactions.



- Graph of transactions within the District of Columbia

37.     Even after a transaction is complete, Athena still does not disclose the fee to the

consumer. After completing a transaction, a consumer receives a receipt from Athena that shows the

cash tendered and the Bitcoin received. Athena's BTM receipts do not itemize transaction fees and leave

consumers with no clear idea of the exorbitant markup they were charged. The only way for users to

determine the amount of the fee is to compare the highly volatile market price of Bitcoin at the exact

moment of the transaction with the fee-inclusive "exchange rate" charged by Athena or by examining

the amount of Bitcoin that ultimately appears in the user's wallet (which is likely controlled by a scammer).

38.     The receipts below show an individual being charged three different "exchange rates," between $90,585 and $93,013 per Bitcoin, when depositing $21,200 into a scammer's wallet across three transactions over the course of an hour. The actual cost of Bitcoin on the date of these transactions was less than $70,000.



39.     Athena's failure to disclose these fees in a clear and transparent manner prevents consumers from making informed financial decisions and results in unsuspecting users paying excessive hidden charges. The company's deceptive pricing structure is particularly harmful consumers, who are often unfamiliar with in-person cryptocurrency transactions and are unlikely to recognize that they are paying an exorbitant markup.

40.     For consumers, the lack of fee disclosures eliminates a critical opportunity to recognize that their money is, in fact, not being "protected" before completing the transaction. But if Athena clearly disclosed its 26% fee before the transaction, some consumers may reconsider before purchasing Bitcoin at Athena's BTMs.

41.     The Office of the Attorney General for the District of Columbia ("D.C. OAG") has publicly confirmed that Athena engages in a pattern of undisclosed, excessive fee practices through its BTMs. On September 8, 2025, the OAG filed suit against Athena for unfair and deceptive trade practices arising from its BTM operations.[1]

42.     According to the D.C. OAG, Athena routinely charged undisclosed transaction fees of up to 26% on consumer transactions—fees that were neither clearly disclosed to users at the time of deposit nor itemized on any receipts or post-transaction confirmations. Moreover, it found that Athena "pocketed hundreds of thousands of dollars in hidden fees on the backs of consumers" while misrepresenting its pricing as transparent and competitive.

43.     The D.C. OAG's investigation further revealed that Athena's BTMs operated without effective consumer-protection controls and that its corporate policies were designed to retain profits from these hidden fees. Despite widespread consumer complaints and evidence that the vast majority of transactions were marred by excessive or undisclosed costs, Athena continued to enforce a "no-refund" policy that prevented consumers from recovering improperly retained funds.

44.     The findings of the D.C. Attorney General corroborate the allegations in this Complaint—namely, that Athena's BTM operations rely on a deceptive and unfair business model that conceals the true cost of transactions, imposes excessive hidden fees, and systematically prevents consumers from obtaining refunds or redress.

### III.    Athena's Refund Policy is Misleading and Unfair

45.     Athena enforces an opaque refund policy that either denies refunds to consumers altogether or caps them arbitrarily, even though, at a minimum, Athena could easily return the hidden transaction fees that it charges and retains.

---

[1] See *Press Release, Office of the Attorney General for the District of Columbia, Attorney General Schwalb Sues Crypto ATM Operator for Facilitating Fraud, Charging Hidden Fees, and Exploiting Consumers* (Sept. 8, 2025), available at https://oag.dc.gov/release/attorney-general-schwalb-sues-crypto-atm-operator (last accessed Oct. 31, 2025).

46.     Athena's Terms of Service tell a story of zero refunds, except in what Athena suggests are limited circumstances required by state law.

> Your transaction will be final once you have inserted cash into a kiosk... All Transaction Service Margins are fully earned when assessed. Unless required by applicable law, no Transaction Service Margins or any amounts paid for cryptocurrencies will be refunded **for any reason**. In the event that a refund needs to be issued, Athena will refer to the legal requirements established in each state and adhere to its respective refund policies. (emphasis added)

47.     In practice, Athena actively avoids issuing refunds to consumers who have clearly been deceived by its failure to honestly and transparently disclose its fee practices.

48.     Athena fails to disclose to consumers—at any point during or after a transaction—that it retains a significant portion of each transaction as an undisclosed fee. Consumers are not informed, either on the machine, in receipts, or through Athena's customer service channels, that the company withholds as much as 25% of each cash deposit as its own profit. does not disclose to elderly (and other) fraud victims at any point during or after the transaction, including when they report fraud and request a refund, that Athena retains a significant percentage of a victim's losses as a transaction fee.

49.     Even when consumers persistently dispute their charges and involve law enforcement or regulatory authorities, Athena arbitrarily limits the amount it is willing to refund. According to Sam Nazzaro, Athena's Chief Compliance Officer and Regulatory Counsel, Athena's "Board of Directors has instituted a limited fee refund policy even though there is no legal or statutory obligation to do so..." and that policy "caps the potential gross profit refunds at $7500" because "gross profit reflected on any purchase does not take into account the various costs with running this business." This policy confirms that Athena's so-called "refund" process is not designed to make consumers whole but to preserve the company's unlawful retention of undisclosed fees.

50.     Athena's failure to clearly disclose its fees or provide full refunds constitutes an unfair and deceptive trade practice. Consumers have no meaningful opportunity to learn of these

charges before completing their transactions, and Athena's internal refund cap ensures that even aggrieved consumers who discover the overcharges cannot recover the full amount wrongfully withheld..

51.     Recognizing the dangers of unregulated BTMs, certain jurisdictions, including the State of California, where Athena operates, have enacted such protections. *See* Cal. Fin. Code §§ 3902, 3905 (imposing fee disclosure requirements and a $1,000 daily transaction limit). However, Athena has failed to implement any such protections on a national level and continues to operate in a manner that exposed consumers to predictable and preventable financial harm.

### IV.   Athena Uses Misleading "Wallet Attestations" and Disclaimers to Conceal its Fee Practices and Avoid Responsibility for its Overcharges

52.     In addition to concealing its excessive transaction fees, Athena requires consumers to complete a series of on-screen attestations—labeled a "Pledge of Ownership"—that serve no meaningful consumer-protection purpose but instead operate to shield Athena from liability for its undisclosed fees. After inserting cash and selecting a transaction amount, users are required to check several boxes confirming statements drafted by Athena before the transaction will proceed:

 

*(Athena wallet confirmation before June 2024)*          *(After June 2024)*

53.     The on-screen prompts (shown above) instruct a user to tick boxes stating, "I understand that the cash inserted into this kiosk will not be returned to me under any circumstances, including cases of fraud." Only after clicking a button the "personal wallet" button does the transaction continue.

54.     Glaringly omitted from these screens are any information about Athena's true fee structure. These disclosures do nothing to inform consumers about the actual costs of using Athena's BTMs or the significant fees Athena withhold from each transaction. The attestations appear immediately before the cash is irrevocably deposited and provide no disclosure of the true exchange rate, the percentage fee being charged, or the amount Athena will retain.

55.     Rather than disclosing that Athena retains up to 25% of each transaction as a hidden fee, the attestations focus on disclaiming Athena's liability while distracting users with irrelevant technical language about wallet generation and ownership.

56.     Athena's so-called "Pledge of Ownership" is designed to shift responsibility to the consumer while masking Athena's own pricing misconduct. The prompts imply that the user's acknowledgment concerns ownership of a Bitcoin wallet, when in fact the practical effect is to obtain a waiver-like confirmation that Athena can complete the transaction and keep its undisclosed fee regardless of whether the consumer understands the process or price.

57.     Even after being alerted by consumers and law enforcement to issues with specific wallet transactions and overcharges, Athena has continued to process transactions without meaningful review or refund. The company's so-called "compliance" features exist solely to preserve the appearance of diligence while maintaining its lucrative, undisclosed fee stream.

58.     Athena's practices illustrate a deliberate pattern of deception: it obscures the true cost of using its BTMs through inflated exchange rates, conceals the magnitude of its fees, and then relies on self-serving disclaimers to avoid accountability. The company's wallet attestations and "no refund" prompts are integral to its overall junk-fee scheme.

59.     By forcing consumers to click through these misleading confirmations while withholding critical information about its fees, Athena has engaged in an unfair and deceptive practice in violation of state consumer-protection laws. The attestations are not bona fide consumer disclosures—they are instruments of concealment designed to legitimize Athena's undisclosed, excessive charges and to preclude consumers from obtaining refunds.

## CLASS ALLEGATIONS

### PROPOSED CLASS

60.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and all others similarly situated.

61.     Plaintiff brings this case on behalf of a Class defined as follows:

> **All persons in the United States who, during the applicable statute of limitations, used an Athena Bitcoin automated teller machine ("BTM") to purchase cryptocurrency and were charged a BTM Fee**

62.     Excluded from the Class are Defendant, its officers, directors, employees, and agents, as well as this Court and its staff. Plaintiff does not yet know the precise number of Class members but believes that they number in the thousands nationwide.

### NUMEROSITY

63.     The Class is so numerous that joinder of all members is impracticable. Athena operates more than 3,500 BTMs across the United States and processed tens of thousands of consumer transactions involving the same undisclosed fees and refund practices described herein.

64.     The exact number and identity of Class members can be determined from Defendant's own transaction and customer-service records, which are within Defendant's possession, custody, or control.

### COMMON QUESTIONS OF LAW AND FACT

65.     There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class.  Among the questions of law and fact common to the Class are:

a)   Whether Athena failed to clearly and conspicuously disclose material transaction fees or markups;

b)   Whether Athena misrepresented or omitted material information regarding its pricing structure, including the actual exchange rate used to calculate the amount of bitcoin delivered to consumers;

    c) Whether Athena's fee practices constitute deceptive or unfair acts under Fla. Stat. § 501.204;

    d) Whether Athena's "no-refund" and refund-cap policies are unconscionable and unlawful;

    e) Whether Athena standardized BTM interfaces, Terms of Service, and disclosures are misleading, unconscionable, or designed to conceal the true cost of transaction;

    f) Whether Class members suffered economic injury as a result of Athena's conduct; and

    g) The proper measure of damages, restitution, and injunctive relief.

66. These questions are capable of common proof using Athena's uniform policies, transaction data, and marketing materials.

### TYPICALITY

67. Plaintiff's claims are typical of those of all Class members. Plaintiff and each Class member used Athena's BTMs under the same deceptive fee structure and were subject to the same Terms of Service and refund policies.

### ADEQUACY OF REPRESENTATION

68. Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class, and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

### SUPERIORITY

69. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual

lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

70.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another may not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

**COUNT I**
**Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq.**
**(On Behalf of Plaintiff and the Class)**

71.     Plaintiff repeats and realleges the paragraphs 1 through 70 of this Complaint and incorporates them by reference herein.

72.     Plaintiff and the members of the Class and Subclass are "consumers" under Fla. Stat. § 501.203(7) in that they purchased or paid for goods and services from Athena primarily for personal, family, or household purposes.

73.     At all relevant times, Defendant Athena Bitcoin, Inc. was a "person" within the meaning of Fla. Stat. § 501.203(6) and was engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8) by marketing, selling, and operating cryptocurrency automated teller machines ("BTMs") available to consumers in Florida and throughout the United States.

74.     Athena maintains its principal place of business and executive operations in the State of Florida, from which it manages, directs, and controls all aspects of its BTM network, including pricing algorithms, transaction processing, fee-setting, refund policies, and customer-service operations.

75.     The deceptive and unfair conduct challenged herein originated, emanated, and was orchestrated from Athena's headquarters in Florida. The company's pricing policies, on-screen

disclosures, and refund protocols were developed, approved, and disseminated from Florida, and all BTM transactions nationwide—including those affecting out-of-state consumers—were processed through systems and personal located in Florida.

76.     F DUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances, and unfair if it offends established public policy or is immoral, unethical, oppressive, or substantially injurious to consumers.

77.     Athena has engaged in unfair and deceptive acts and practices in violation of FDUTPA through its operation of BTMs that systematically conceal, misrepresent, and obscure the true nature and amount of the transaction fees, spreads, and markups it charges to consumer. Athena engaged in unfair and deceptive acts or practices that were likely to mislead reasonable consumers acting under the circumstances and that caused substantial consumer injury not outweighed by any countervailing benefit.

78.     Specifically, Athena misrepresented, omitted, and failed to disclose material information regarding the existence and magnitude of its transaction fees, including by:

   a.   Failing to disclose its excessive transaction fees before consumers insert cash. Consumers are not informed that they will be charged a fee of up to 26%, nor are they provided with a clear explanation of how the fee is calculated. Instead, Athena buries the fee within a misleading "exchange rate," which prevents consumers from understanding the true cost of their transaction.

   b.   Misrepresenting the displayed "price of Bitcoin" as a market rate when it includes undisclosed surcharges and inflated exchange spreads;

   c.   Imposing and retaining excessive, undisclosed fees—often between 10% and 26% of the transaction value—as profit;

d.  Enforcing a blanket "no-refund" and "refund-cap" policy that prevents consumers from recovering improperly retained fees;

e.  Designing misleading on-screen attestations and prompts that omit the true cost of the transaction and suggest, falsely, that users are confirming only wallet ownership rather than waiving fee disclosure rights; and

f.  Impliedly representing to consumers that it has a money transmission license to operate in Florida when in fact it does not. Florida consumers insert money into Athena BTMs for transmission, and Athena transmits money on their behalf.

79.  Athena's Terms of Service contain unconscionable provisions—including blanket no-refund clauses and arbitrary refund caps—that unfairly shift all risk consumers while allowing Athena to retain up to 26% of the transaction amount.

80.  Athena's uniform conduct constitutes "unfair or deceptive acts or practices" within the meaning of Fla. Stat. § 501.204(1).

81.  Athena's deceptive conduct emanated from Florida and was disseminated nationwide through its standardized BTMs, websites, and customer-service practices. As a result, consumers located outside Florida—including Plaintiff—were directly and foreseeably injured by deceptive and unfair conduct originating in Florida.

82.  Athena's misrepresentations and omissions were likely to mislead, and did mislead, reasonable consumers into believing that the prices and fees displayed on Athena's BTMs were transparent, fair, and fully disclosed.

83.  Athena's conduct is unfair and unconscionable because it offends established public policy favoring transparency and accurate price disclosure, is unethical and oppressive in its effect, and causes substantial injury to consumers that outweighs any purported benefit to the company.

84.     Plaintiff and members of the Class suffered actual damages as a direct and proximate result of Athena's deceptive and unfair conduct. Consumers paid more than they reasonably expected or agreed to pay due to Athena's failure to disclose hidden fees and spreads.

85.     Pursuant to Fla. Stat. §§ 501.211(1) and (2), Plaintiff and the Class seek declaratory and injunctive relief to enjoin Athena's unlawful practices, restitution and disgorgement of amounts wrongfully retained, actual damages, attorneys' fees, and costs, as well as all other relief the Court deems just and proper.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

### JURY DEMAND

Plaintiff and Class Members hereby demand a trial by jury.

Dated November 6, 2025

Respectfully submitted,

*/s/ Andrew Shamis*
Andrew J. Shamis
Florida Bar No. 101754
Edwin E. Elliott
Florida Bar No. 1024900
**SHAMIS & GENTILE, P.A.**
ashamis@shamisgentile.com
edwine@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq.
Florida Bar No. 0100537
scott@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180

*Counsel for Plaintiff and the Proposed Class*